# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **CONSTRUCTION MANAGEMENT, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **EXPO HOSPITALITY, LLC,** ) | |
| ) | |
| **Defendant.** ) | **Case No. 3:19-cv-00298** |
| ) | **Judge Aleta A. Trauger** |
| ) | |
| **EXPO HOSPITALITY, LLC,** ) | |
| ) | |
| **Counter-/Third Party Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **CONSTRUCTION MANAGEMENT, INC.,** ) | |
| **DUSTIN GEDITZ, and** ) | |
| **WILLIAM COULSON,** ) | |
| ) | |
| **Counter-/Third Party Defendants.** ) | |

# MEMORANDUM

Construction Management, Inc. ("CMI"), Dustin Geditz, and William Coulson have filed a Motion to Dismiss Defendant's Counterclaims (Docket No. 12), to which Expo Hospitality, LLC ("Expo") has filed a Response (Docket No. 17), and CMI, Geditz, and Coulson have filed a Reply (Docket No. 18). For the reasons set out herein, that motion will be granted in part and denied in part.

# I. BACKGROUND[1]

Expo, a Tennessee company, owns land in Rutherford County, Tennessee, that it wished to develop into a hotel. (Docket No. 9 ¶ 74.) CMI is a South Dakota-based construction contractor. (*Id.* ¶ 75.) Expo identifies third-party defendants Dustin Geditz and William Coulson as South Dakota residents who incorporated CMI, with Coulson continuing to serve as its president. (*Id.* ¶ 76–77, 82–84.) CMI claims that, on July 12, 2017, Expo and CMI entered into an agreement for CMI to build an 81-unit hotel on Expo's land, to be operated under the Best Western Glo Hotel brand. (Docket No. 1 ¶¶ 6–7.) The putative agreement called for CMI to be paid on a "cost-plus" basis, meaning that its payment was not fixed, but rather would be determined based on the costs of the project plus a fee. Accordingly, CMI was to submit an "Application for Payment" on or after the 20th of each month, and, by the 10th of the next month, Expo would pay CMI what it was owed, based on the costs and fees set out in the Application. (*Id.* ¶ 10–11.)

CMI performed some early work on the project, including performing grading and erosion control, installing utilities, pouring footings, and completing preliminary drawings for the development. (*Id.* ¶ 16–18.) Expo, however, stopped providing payment in response to CMI's Applications, beginning in July 2018. (*Id.* ¶ 23.) CMI suggests that Expo's decision may have been related to the fact that Expo had changed its mind about the nature of the development and now wished to build a hotel to operate under the Avid IHG brand, not the Best Western Glo brand. (*Id.* ¶¶ 19–21.)

Expo, however, points to a different problem, having to do with CMI's licensure as a general contractor. Under Tennessee law, "[a]ny person, firm or corporation engaged in

---

[1] The facts are taken from CMI's Complaint (Docket No. 1) and Expo's Answer and Corrected Counter-Complaint and Third-Party Complaint (Docket No. 9). For the purposes of the Motion to Dismiss, the facts offered in support of Expo's claims are taken to be true.

contracting in th[e] state shall be required to submit evidence of qualification to engage in contracting, and shall be licensed" under the state's system. Tenn. Code Ann. § 62-6-103(a)(1). A general contractor's license in Tennessee, however, is not an all-or-nothing proposition. Rather, the state's scheme calls for a graduated system of licenses pursuant to which a licensee is permitted to work on projects below a certain value. "It is unlawful for any person, firm, or corporation to engage in or offer to engage in contracting for any project in [Tennessee], unless, at the time of such engagement or offer to engage, the person, firm, or corporation has been duly licensed with a monetary limitation sufficient to allow the person, firm, or corporation to engage in or offer to engage in such contracting project . . . ." *Id.*

Coulson formed CMI as a South Dakota corporation on March 9, 2015, and he submitted an application for a Tennessee contractor's license on its behalf on April 21, 2015. (Docket No. 9 ¶¶ 85–88, 95; Docket No. 9-5.) Included with that application was an affidavit in which Coulson and Geditz claimed that CMI had not "bid, offered to engage[,] or performed" any construction in the state worth over $25,000 before applying for the license. (Docket No. 9-5 at 6.) Expo contends that that affidavit was false, because Coulson and CMI had already contracted on an earlier hotel project in Nashville's Metro Center area. (Docket No. 9 ¶ 92.)

On or around May 20, 2015, CMI filed a "Hardship License Request" with the Tennessee Board of Licensing and Contractors. (*Id.* ¶ 97; Docket No. 9-7.) The initial purpose of the request was to obtain a license with no monetary limit. (Docket No. 9 ¶ 97.) On June 29, 2015, however, CMI revised its request to seek a license with a monetary limit of $284,000. (*Id.* ¶ 98; Docket No. 9-8.) On July 31, 2015, CMI was issued a license with a monetary limit of $284,200. (Docket No. 9-10.) When the license was issued, the Board for Licensing Contractors sent CMI a letter, dated

June 30, 2015, confirming that the company had been granted a license and listing the details of the license, including the monetary limit ("Confirmation Letter"). (Docket No. 9-9.)

At some point—Expo suggests it was shortly after the Confirmation Letter was received—someone altered the Confirmation Letter to appear, falsely, to confirm that CMI had received a license with no monetary limitation. (Docket No. 9 ¶ 104.) CMI then, in Expo's words, "represented to the public that CMI was a board qualified contractor licensed to build hotels in the State of Tennessee with an unlimited budget." (*Id.* ¶ 105.) As an example, Expo points to CMI's website, in which the company claims, "We are either licensed or capable of licensing in all lower 48 states." (*Id.* ¶ 108.) The website also boasts of two prior Tennessee hotels that CMI allegedly built—which, Expo suggests, implies to the public that CMI has the licensure necessary to complete such projects. Expo also claims that "Coulson fraudulently represented to the [sic] Expo Hospitality that CMI was a board qualified contractor in the State of Tennessee to build hotels with an unlimited budget," although Expo does not explain when or how such representations were made. (*Id.* ¶ 106.)

Expo alleges that it was in the context of this ongoing misrepresentation that CMI, in 2017, bid on the contract to build the Rutherford county hotel, despite the project's having an estimated cost of over six million dollars, well beyond CMI's actual licensure. (*Id.* ¶¶ 115, 122.) Although the parties initially proceeded as if CMI had won the bid, Expo maintains that it never signed a written contract, meaning that the work performed was governed by the oral agreement between the parties involving preliminary work. (*Id.* ¶¶ 126–27.) Expo states that CMI, Coulson, and Geditz "were responsible for [obtaining] the required permits and documents for the construction of the project." (*Id.* ¶ 125.) When Expo was unable to obtain the required building permit, the company and, according to Expo, Coulson and Geditz "continued to represent that the reason they could not

get a building permit was an issue with the paperwork and affirmatively denied that there was an issue with the license." (*Id.* ¶ 128.) Although CMI performed some site preparation work, such as the aforementioned grading, actual construction was delayed due to the lack of a permit. (*Id.* ¶¶ 132–33.)

On October 6, 2018—a few months after Expo had stopped paying CMI—a Clarksville man named Mike Hudson filed a complaint with the Board of Licensing that "CMI is building hotels across the state by using a falsified document," which he described as the modified Confirmation Latter. (*Id.* ¶ 138; Docket No. 9-15 at 2.) The Board investigated the matter and concluded that the allegation was supported and that CMI had been using the altered Confirmation Letter to obtain permits to which it was not entitled. As a result, it suspended CMI's license. (Docket No. 9 ¶¶ 139–43.)

On March 22, 2019, CMI filed a Demand for Arbitration against Expo. (Docket No. 9-19.) Expo contested the arbitrability of the dispute, and CMI elected to waive any right to arbitration "[i]n the interests of avoiding a protracted dispute" over arbitrability. (Docket No. 1 ¶¶ 48–49.) On April 9, 2019, CMI filed its Complaint in this court, pleading claims for breach of contract, quantum meruit, and unjust enrichment. (Docket No. 1 ¶¶ 50–58.) Expo filed an Answer and Counter-Complaint (Docket No. 8), which it shortly thereafter superseded with its Answer and Corrected Counter-Complaint (Docket No. 9). Expo states causes of action against CMI, Coulson, and Geditz, whom the Counter-Complaint largely discusses collectively. It pleads what it characterizes as eight claims[2]: declaratory relief (Count I); intentional misrepresentation/conspiracy (Count II); rescission (Count III); violation of Tenn. Code Ann. § 62-6-103 (Count IV); violation of Tenn. Code Ann. § 62-6-136 (Count V); punitive, treble, and/or

---

[2] Some of the items that Expo characterizes as distinct causes of action appear, in fact, merely to be types of damages or remedies.

consequential damages (Count VI); unjust enrichment (Count VII); and attorney's fees (Count VIII). (Docket No. 9 ¶¶ 150–219.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff" and "accept its allegations as true." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Unless additional pleading requirements specific to the plaintiff's claims say otherwise, the Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Rule 9(b) of the Federal Rules of Civil Procedure states that, when pleading fraud, "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained

that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

### III. ANALYSIS

#### A. Failure to Plead with Particularity

CMI, Coulson, and Geditz argue that Expo has failed to plead fraud with the level of particularity required by Rule 9(b). Specifically, they complain that the Answer and Corrected

7

Counter-Complaint improperly refers to CMI, Coulson, and Geditz collectively, without identifying fraudulent actions attributable to any of them specifically, and that Expo has failed to identify specific instances of misrepresentations to Expo on which Expo reasonably relied. Expo responds that it has been unable to plead with more specificity because, without discovery, it cannot know the details of how CMI came to start misrepresenting its licensure status to the world and, in particular, what roles Coulson and/or Geditz played in the scheme individually. In the alternative, Expo asks that it be permitted to amend its counterclaims/third-party claims rather than having them dismissed outright.

Generally speaking, a plaintiff seeking to comply with Rule 9(b) must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bledsoe*, 501 F.3d at 504 (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). Courts, however, have recognized that fraud often involves subterfuge and misdirection that may leave a victim in the dark about many of the details of a scheme, even after he realizes he has been defrauded. Accordingly, "Rule 9(b)'s particularity requirement may be relaxed when certain information is solely within the defendant's knowledge." *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 630 (N.D. Ohio 2016) (quoting *SEC v. Blackwell*, 291 F. Supp. 2d 673, 691 (S.D. Ohio 2003)). In that light, Rule 9(b) does not require Expo to know, for example, who originally altered the Confirmation Letter or whether any CMI employees may, in fact, have been deceiving each other.

Rule 9(b)'s flexibility with regard to information outside the reach of a plaintiff, however, cannot excuse all of Expo's omissions. A plaintiff asserting a cause of action for intentional misrepresentation must establish six elements:

> (1) that [the defendant] made a representation of an existing or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that [the defendant] made the representation recklessly, with knowledge that it was false, or without belief that the representation was true; (5) that the [plaintiff] reasonably relied on the representation; and (6) that [the plaintiff was] damaged by relying on the representation.

*Davis v. McGuigan*, 325 S.W.3d 149, 154 (Tenn. 2010) (citing *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)). In order to effectively plead any of those elements, a plaintiff must identify, at least generally, "who [is alleged to have] made particular misrepresentations and when they were made." *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992). Without a clear identification of the allegedly false statements and their speakers, one cannot effectively assert the elements of falsity, materiality, knowledge, or reasonableness of reliance. Without at least some sense of the timing of the statements—and, therefore, their context within the parties' course of business—one cannot effectively assert materiality, reliance, or damages. Expo, however, describes CMI's scheme only generally, with very little detail regarding specific misrepresentations made to CMI itself, as opposed to, for example, false statements made to permitting authorities. While Expo does allege that CMI misrepresented the reasons for its permit delay, Expo does not explain who said what, when it was said, or how Expo relied on the statement. Expo, moreover, cannot merely point to the altered letter as the basis for its claims, because it appears that the purpose of the letter was to deceive permitting offices, not Expo. Expo is required to describe, with particularity, how *it* was defrauded—for example, by describing specific misrepresentations, by and to identifiable people, about the scope of CMI's licensure.

Moreover, CMI, Coulson, and Geditz are correct that, when pursuing claims against multiple defendants, "a fraud claim requires specific allegations as to each defendant's alleged involvement . . . ." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,

9

929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). Mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s specificity requirements . . . ." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005). While Expo may not be able to know what went on between Coulson and Geditz behind closed doors, it should at least be able to assert clearly what each man did or did not say to particular Expo personnel. If there is information Expo lacks—for example, the precise date or wording of a communication—it can simply say so in its statement of its claims. Rule 9(b) does not require perfect recollection—it merely requires enough particularity for each defendant to know what the claims against him are about.

Because Expo has failed to tie each defendant to a specific, identifiable false statement at a specific time (or at least a reasonably described range of possible dates), it has not met the requirements of Rule 9(b). Nevertheless, the court finds good reason to allow Expo to amend its statement of its claims. This case is early in the proceedings, and the issues underlying Expo's fraud allegations are central to the case, whether Expo's claims continue or not. The court, accordingly, will allow Expo to file an Amended Answer and Corrected Counter-Complaint.

The fact that Expo will presumably be providing a more detailed account of its theory of the fraud obviates any need by the court to consider several of CMI's other arguments. For example, CMI argues that Expo has failed to plead reasonable reliance—an issue that the court can, if CMI so moves, revisit when the fraud is more clearly explained. Similarly, CMI has challenged Expo's conspiracy claims as suffering from the same "group pleading" flaws that the fraud claims do. Since CMI will have the opportunity to revise those allegations, there is no reason to consider conspiracy now. Some of CMI's arguments, however, can be considered independently of Expo's Rule 9(b) shortcomings, so the court will consider those issues here.

**D. Rescission**

CMI, Coulson, and Geditz argue that, even if Expo's allegations are true, Expo is not entitled to rescission of its contract with CMI because it is not possible to restore the parties to the position that they were in before their agreement. *See Song v. Chung*, No. E2018-00114-COA-R3-CV, 2018 WL 5618114, at *10 (Tenn. Ct. App. Oct. 30, 2018) ("[I]t is a fundamental rule in equity [that] a contract will not be rescinded if the parties cannot be placed in status quo.") (quoting *Lindsey-Davis Co. v. Siskin*, 358 S.W.2d 331, 333 (Tenn. 1962)). CMI argues that it has already expended resources doing grading work and site preparation for the hotel project, and it would be impractical and unnecessary, if even possible, to undo that work in order to restore a pre-agreement status quo. It likens the situation to *Lamons v. Chamberlain*, 909 S.W.2d 795 (Tenn. Ct. App. 1993), in which the Tennessee Court of Appeals held that rescission was inappropriate in the case of a sale contract for a business, because the buyer had already taken control of the business and invested in its continuing operation, making it impossible to restore the pre-sale status quo. *Id.* at 801.

"A rescission amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination . . . . It is the annulling, abrogation of the contract and the placing of the parties to it in status quo." *Stonecipher v. Estate of Gray*, No. M1998-00980-COA-R3CV, 2001 WL 468673, at *4 n.2 (Tenn. Ct. App. May 4, 2001) (quoting 22 Tenn. Juris., Rescission, Cancellation and Reformation § 1 at 34 (1999)). Rescission "can be an appropriate remedy for a fraudulent misrepresentation surrounding the formation of a contract." *Id.* (citing *Atkins v. Kirkpatrick*, 823 S.W.2d 547 (Tenn. Ct. App. 1991)). However, because "the purpose of rescission is to return the parties to the position they would have been in had the contract not existed," the remedy is not available "[i]f the parties cannot be returned to status quo, or . . . if due

11

to the passage of time or other changed circumstances, equity cannot be done." *Id.* at *5 (citing *Lindsey-Davis Co.*, 358 S.W.2d at 333; *Lamons*, 909 S.W.2d at 801).

Because rescission is so closely bound up with fraud, some aspects of its availability would be inappropriate to consider until Expo is able to amend its claims. The question of the impossibility of restoring the status quo, however, presents a separate issue that the court can consider here. Expo's response to CMI's rescission argument consists largely of arguing, in a conclusory manner, that a court should not resolve the question of whether to allow rescission at the Rule 12(b)(6) stage. But a party seeking to defeat a Rule 12(b)(6) motion must do more than merely remind the court, generally, of the rule's limited scope. Expo has offered no explanation of how the status quo between the parties could be restored, either in its briefing or in its Answer and Corrected Counter-Complaint, other than merely granting Expo money damages. (Docket No. 9 ¶ 180.) Awarding damages, however, would not be a true restoration of the pre-deal status quo, and, in any event, Tennessee law does not permit rescission "if an award of damages would be an adequate remedy." *Case Handyman Serv. of Tennessee, LLC v. Lee*, No. M2011-00751-COA-R3CV, 2012 WL 2150857, at *7 (Tenn. Ct. App. June 13, 2012) (quoting *Douglas v. Foster*, 2002 WL 83605, at *1 (Tenn. Ct. App. Jan. 22, 2002)). Because Expo has identified no basis for allowing its rescission claim to continue, Count III of its Answer and Corrected Counter-Complaint will be dismissed.

### E. Statutory Claims (Tenn. Code Ann. §§ 62-6-103, -136)

CMI, Coulson, and Geditz argue that Expo's Counts IV and V, which plead, respectively, causes of action under Tenn. Code Ann. §§ 62-6-103 and -136, should be dismissed because Expo has failed to plead valid causes of action under either statute. Specifically, with regard to § 62-6-103, they argue that Count IV should be dismissed because the provision does not create any

statutory cause of action. *See Nguyen v. Hart*, 1993 WL 291411, at *3 (Tenn. Ct. App. July 29, 1993) (recognizing that § 62-6-103 does not create a cause of action). Under Tennessee law, "[i]n order for legislation enacted by the general assembly to create or confer a private right of action, the legislation must contain express language creating or conferring the right." Tenn. Code Ann. § 1-3-119(a). Section 62-6-103 sets out limitations on what an unlicensed contractor can recover in court when the unlicensed contractor is itself the plaintiff, but the statute does not contain any language creating a cause of action against such a contractor. In its Response, Expo argues that Count IV should nevertheless not be dismissed because it is "a cognizable claim based on fraud."[3] (Docket No. 17 at 13.) A claim cognizable as fraud, however, is just a fraud claim or, in other words, a claim for intentional misrepresentation; there is no reason to rely on the statutory peg of § 62-6-103. This count, therefore, will be dismissed, and any allegations associated with it can be subsumed into Expo's intentional misrepresentation claim.

Section 62-6-136 forbids an unlicensed "person, firm, or corporation" from representing itself as or acting as a "contractor," as the term is used in Tennessee's licensure laws. Tenn. Code Ann. § 62-6-136(a). Section 62-6-136, like Tenn. Code Ann. § 62-6-103, does not, in and of itself, create a cause of action. Section 62-6-136(b), however, provides that "a violation of this section shall be construed to constitute an unfair or deceptive act or practice affecting the conduct of trade or commerce under the Tennessee Consumer Protection Act ["TCPA"]," meaning that "the private right of action remedy under the [TCPA] shall be available to any person who suffers an ascertainable loss of money or property, real, personal or mixed, or any other article, commodity

---

[3] Expo's argument is based on its reading of the Tennessee Court of Appeals' opinion in *Nguyen v. Hart*, 1993 WL 291411, at *3, in which the court wrote that § 62-6-103 "does not authorize a recovery from the [unlicensed] contractor for amounts voluntarily, knowledgeably and in the absence of fraud paid to him by an owner." In context, however, it is clear that the court's mention of fraud is merely an acknowledgment that amounts obtained by fraud would be recoverable through ordinary tort law—not that they would be recoverable via an independent cause of action created by § 62-6-103.

13

or thing of value wherever situated as a result of the violation." Tenn. Code Ann. § 62-6-136(a). Accordingly, characterizing Count V as a claim under § 62-6-136 is, technically, a misnomer, because that statute merely acknowledges and defines a particular type of TCPA claim. *See* Tenn. Code Ann. §§ 47-18-104(b)(35), -109(a)(1) (allowing TCPA cause of action based on actions of unlicensed contractor). The court, accordingly, will construe Count V as raised under the TCPA. Although CMI suggests, in its briefing, that Expo's TCPA claim is conclusory, the citation to Tenn. Code Ann. § 62-6-136, in the context of the facts alleged, makes clear that Expo's TCPA claim arises out of the same allegations at issue with regard to its intentional misrepresentation claim. Given that the court is allowing Expo to clarify those allegations, it will not evaluate them in their totality here.

CMI, Coulson, and Geditz argue next that Expo improperly relies on Tenn. Code Ann. § 62-6-136(c), which provides that

> [a]n individual who violates this section and would, but for this section, have limited liability as owner of an entity having limited liability protection, including, but not limited to, a corporation, is personally liable for the individual's own representations, acts or omissions to the same extent as if that individual rendered the representations, acts or omissions as an individual.

Tenn. Code Ann. § 62-6-136(c). Expo seeks to rely on that provision to state claims against Geditz and Coulson. CMI argues that the court should dismiss those claims, because Expo has not specifically alleged that Coulson or Geditz is an owner of CMI. Expo points out that its Answer and Corrected Counter-Complaint includes, as an attachment, licensure paperwork for CMI, which identifies William Coulson as having 100% ownership of the entity. (Docket No. 9-5 at 3.) Expo argues that that allegation is incorporated, by reference, into its statement of its claims via Fed. R. Civ. P. 10(c). Coulson responds that the mention of his ownership in the paperwork is insufficient because it does not amount to an allegation that he was the owner of CMI on the specific date of

14

the wrongdoing. While that may be true, the clear implication, from the Complaint and referenced documents as a whole, is that Coulson was, based on Expo's information and belief, the owner of CMI throughout the relevant time period. The court will not require magic language to that express effect. Reading the Answer and Corrected Counter-Complaint in the light most favorable to Expo, it has adequately alleged that Coulson is the owner of CMI for purposes of Tenn. Code Ann. § 62-6-136(c).

By the same token, however, the very document on which Expo relies states that Geditz was *not* an owner. Indeed, the only basis that Expo identifies for considering Geditz an owner is that he is listed as a "qualifying agent." (Docket No. 17 at 15.) Tenn. Code Ann. § 62-6-136(c) is, therefore, inapplicable to him. Expo has not advanced any argument for applying Count V to Geditz other than through Tenn. Code Ann. § 62-6-136(c); the court will, therefore, dismiss that claim as to him.

### F. Unjust Enrichment

CMI, Coulson, and Geditz argue that Expo's claim for unjust enrichment should be dismissed because unjust enrichment only applies to situations in which the parties do not have a written contract governing the matter at issue. In the alternative, CMI argues that the court should dismiss the claim because Expo has failed to plead the elements of the cause of action.

Because unjust enrichment is an equitable cause of action intended to reach situations that traditional contract law does not cover, "recovery under unjust enrichment is not available when the parties have a valid contract on the matter at issue." *Hayes v. Washburn*, No. M2006-01135-COA-R3-CV, 2007 WL 3202765, at *5 (Tenn. Ct. App. Oct. 31, 2007). Here, the parties agree that, at the time that the parties were first doing business with each other, they believed that there was at least some form of an agreement between them, if only an oral agreement regarding

15

preliminary work on the site. Expo, however, contests the validity of any such agreement as having been fraudulently procured by CMI. It, therefore, pleads unjust enrichment as an alternative basis for recovery, should the court agree and conclude that there was no valid contract between the parties. Such alternative pleading is permissible, and the court will not dismiss CMI's unjust enrichment claim on that ground.

Under Tennessee law, the elements of a claim of an unjust enrichment claim are: (1) a benefit was conferred upon the defendant by the plaintiff; (2) the defendant appreciated the benefit; and (3) it would be inequitable for defendant to retain the benefit without paying for it. *Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006) (quoting *Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005)). CMI argues that Expo has not pleaded that CMI obtained and appreciated a benefit that would be inequitable for it to retain. Expo responds that CMI improperly obtained payments for overhead and profits from Expo that were premised on Expo's mistaken belief that CMI was properly licensed. Tennessee law allows an unlicensed contractor or a contractor acting outside the bounds of its license to recover for the expenses of the work it performed but does not allow the unlicensed or noncompliant contractor to seek any other damages. *See* Tenn. Code Ann. § 62-6-103(b); *Pickens v. Underwood*, No. E2017-02120-COA-R3-CV, 2018 WL 2948425, at *9 (Tenn. Ct. App. June 12, 2018), *appeal denied* (Sept. 14, 2018); *Katmai Support Servs., LLC v. Knoxbi Co., LLC*, No. 3:15-CV-014-HBG, 2015 WL 5714558, at *2 (E.D. Tenn. Sept. 29, 2015); *Nguyen*, 1993 WL 219411, at *3. CMI's retention of payment from Expo in excess of expenses may, therefore, support an unjust enrichment claim.

CMI, Coulson, and Geditz argue next that, even if Expo has stated a claim for unjust enrichment by CMI, it has failed to do so with regard to Coulson and Geditz as individuals. In its Response, Expo fails to address this argument and merely states, in a conclusory manner, that all

16

three defendants were unjustly enriched. Expo does not cite to any cases allowing a plaintiff in a case such as this to proceed with an unjust enrichment claim against an employee or principal merely because some portion of a company's ill-gotten profits was passed on to him as an individual. Nevertheless, because the court is already allowing Expo to amend its statement of its claims to more clearly delineate each defendant's role in the alleged wrongdoing, the court will not, at this juncture, dismiss the unjust enrichment claims against the individual defendants. CMI, however, is free to raise this argument again after the amendment.

### F. Attorney's Fees

CMI, Coulson, and Geditz argue that Expo has not stated grounds for recovery of attorney's fees. That argument, however, hinges on the assumption that Expo has not properly pleaded a claim under the TCPA. The TCPA expressly authorizes the court to award a prevailing plaintiff "attorney's fees and costs." Tenn. Code Ann. § 47-18-109(e)(1). Because Expo has pleaded a TCPA claim via Tenn. Code Ann. § 62-6-136, there is no ground for dismissing its claim for attorney's fees at this juncture.

### IV. CONCLUSION

For the foregoing reasons, CMI's Motion to Dismiss Defendant's Counterclaims (Docket No. 12) will be granted in part and denied in part. Counts III and IV will be dismissed, and Count V will be dismissed as to Dustin Geditz. Expo will be permitted to amend its Answer and Corrected Counter-Complaint to comply with Rule 9(b) of the Federal Rules of Civil Procedure.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge