UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **CONSTRUCTION MANAGEMENT, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| **EXPO HOSPITALITY, LLC,** ) | |
| ) | |
| **Defendant.** ) | **Case No. 3:19-cv-00298** |
| ) | **Judge Aleta A. Trauger** |
| ) | |
| **EXPO HOSPITALITY, LLC,** ) | |
| ) | |
| **Counter-/Third Party Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| **CONSTRUCTION MANAGEMENT, INC.,** ) | |
| **DUSTIN GEDITZ, and** ) | |
| **WILLIAM COULSON,** ) | |
| ) | |
| **Counter-/Third Party Defendants.** ) | |

## **MEMORANDUM**

Construction Management, Inc. ("CMI"), Dustin Geditz, and William Coulson ("CMI Parties") have filed a Partial Motion to Dismiss Defendant's Amended Counterclaims (Docket No. 25), to which Expo Hospitality, LLC ("Expo") has filed a Response (Docket No. 27), and the CMI Parties have filed a Reply (Docket No. 28). For the reasons set out herein, that motion will be granted in part and denied in part.

# I. BACKGROUND[1]

Expo, a Tennessee company, owns land in Rutherford County, Tennessee, that it wished to develop into a hotel. (Docket No. 23 ¶¶ 2, 44.) CMI is a South Dakota-based construction contractor. (*Id.* ¶ 3.) Expo identifies third-party defendants Dustin Geditz and William Coulson as South Dakota residents who incorporated CMI, with Coulson as its sole owner and president. (*Id.* ¶¶ 3–6, 7–8, 16.)

Under Tennessee law, "[a]ny person, firm or corporation engaged in contracting in th[e] state shall be required to submit evidence of qualification to engage in contracting, and shall be licensed" under the state's system. Tenn. Code Ann. § 62-6-103(a)(1). The state's general contractor licensing scheme calls for a graduated system of licenses pursuant to which a licensee is permitted to work on projects below a certain value. "It is unlawful for any person, firm, or corporation to engage in or offer to engage in contracting for any project in [Tennessee], unless, at the time of such engagement or offer to engage, the person, firm, or corporation has been duly licensed with a monetary limitation sufficient to allow the person, firm, or corporation to engage in or offer to engage in such contracting project . . . ." *Id.*

Coulson and Geditz submitted an application for a Tennessee contractor's license on CMI's behalf on April 21, 2015. (Docket No. 23 ¶ 28; Docket No. 9-5.) Included with that application was an affidavit in which Coulson and Geditz claimed that CMI had not "bid, offered to engage[,] or performed" any construction in the state worth over $25,000 before applying for the license. (Docket No. 9-5 at 6.) Expo contends that that affidavit was false. (Docket No. 23 ¶ 29.)

---

[1] The facts are taken from CMI's Complaint (Docket No. 1) and Expo's Amended Counter-Complaint and Third-Party Complaint (Docket No. 23). For the purposes of the Motion to Dismiss, the facts offered in support of Expo's claims are taken to be true.

2

On or around May 20, 2015, CMI filed a "Hardship License Request" with the Tennessee Board of Licensing and Contractors. (*Id.* ¶ 30; *see* Docket No. 9-7.) The initial purpose of the request was to obtain a license with no monetary limit. (Docket No. 23 ¶ 30.) On June 29, 2015, however, CMI filed a second request, seeking a license with a monetary limit of $284,000. (*Id.* ¶ 31; Docket No. 9-8.) On July 31, 2015, CMI was issued a license with a monetary limit of $284,200. (Docket No. 23 ¶ 32; Docket No. 9-10.) When the license was issued, the Board for Licensing Contractors sent CMI a letter, dated June 30, 2015, confirming that the company had been granted a license and listing the details of the license, including the monetary limit. (Docket No. 9-9.)

Expo alleges, "[o]n information and belief," that, "when Defendants Coulson and Geditz as agents of CMI realized they would only receive a contractor's license for $284,200, they conspired together to fraudulently alter the monetary limit" on the physical documentation of the license or a copy thereof "from a limited license of $284,200.00 to an unlimited license." (Docket No. 23 ¶ 36.) The purpose of the fraudulent alteration, Expo alleged, was (1) to be able to bid on Expo's hotel construction project and (2) to be able to fraudulently obtain building permits that it could not have obtained with the cost-limited license. (*Id.* ¶ 39.)

At the times relevant to this case, CMI's website stated that CMI was "either licensed or capable of licensing in all lower 48 states," without mentioning any particular monetary limitation. (*Id.* ¶ 42.) The website also boasted of two prior Tennessee hotels that CMI allegedly built—which, Expo suggests, implied to the public that CMI had the licensure necessary to complete such projects. (*Id.* ¶ 41.)

In 2017, Expo began preparations for its hotel project, for which it would eventually select CMI as the general contractor. (*Id.* ¶ 44.) In or around June 2017, Expo's president, Deven Shah, met with Coulson about the project. According to Expo,

> [d]uring the course of discussions about the new hotel Project, Third-Party Defendant Coulson, as an agent for CMI and Counter- Defendant CMI fraudulently represented to Expo Hospitality and Mr. Shah that CMI was a board qualified contractor in the State of Tennessee to build hotels with an unlimited budget.

(*Id.* ¶ 47.) According to Expo, that representation was not only false but crucial to the parties' capacity to do business together, because the cost of the hotel's construction was sure to be far in excess of the monetary limit that, unbeknownst to Expo, was on CMI's license. (*Id.* ¶ 48–49.)

Ultimately, Expo and CMI appear to have reached general agreement on a framework and a draft contract for CMI to construct the hotel on a cost-plus-fee basis, with a base cost-plus of $6,330,175 and a contractor's fee of 8%, plus a monthly supervision fee. (*Id.* ¶ 59.) However, Expo claims that it did not execute the contract because CMI had, so far, failed to obtain the necessary building permits. (*Id.* ¶ 64.) Coulson continued to represent to Expo that there was a "paperwork issue" with the permits and assured Shah that there was no underlying licensure issue. (*Id.* ¶ 72.)

Although construction in full could not legally begin, CMI began performing some physical site preparation work; Expo claims that CMI "induced" Expo into allowing CMI to do so. (*Id.* ¶ 73.) Expo paid CMI for work it was performing, pursuant to what Expo characterizes as an oral agreement. (*Id.* ¶¶ 84, 90.) Full construction, however, was delayed for months, and, according to Expo, "Coulson continued to lie and tell [Expo] that there was simply a paperwork issue, and continued to assure Expo that CMI had the proper licensure for the complete construction of the hotel." (*Id.* ¶ 79.) Expo alleges that the delay in starting construction caused it damages in lost profits and increased total construction costs. (*Id.* ¶ 81.) Finally, on February 14, 2019, Expo broke off dealings with CMI (*Id.* ¶ 90.)

4

On April 9, 2019, CMI filed its Complaint in this court, pleading claims for breach of contract, quantum meruit, and unjust enrichment. (Docket No. 1 ¶¶ 50–58.) Expo filed an Answer and Counter-Complaint (Docket No. 8), which it shortly thereafter superseded with its Answer and Corrected Counter-Complaint (Docket No. 9). Expo stated causes of action against CMI, Coulson, and Geditz, whom the Counter-Complaint largely discussed collectively. It pleaded what it characterized as eight claims: declaratory relief (Count I); intentional misrepresentation/conspiracy (Count II); rescission (Count III); violation of Tenn. Code Ann. § 62-6-103 (Count IV); violation of Tenn. Code Ann. § 62-6-136 (Count V); punitive, treble, and/or consequential damages (Count VI); unjust enrichment (Count VII); and attorney's fees (Count VIII). (Docket No. 9 ¶¶ 150–219.)

The CMI Parties moved for dismissal of Counts II through VII of Expo's claims. (Docket No. 12.) On July 8, 2019, the court granted the motion in part and denied it in part. (Docket No. 21.) The court dismissed Counts III and IV on the grounds, respectively, that rescission was inappropriate for the situation described and Tenn. Code Ann. § 62-6-136 did not create a cause of action. (Docket No. 20 at 11–13.) The court dismissed Count V as to Geditz, on the ground that it stated a claim only against CMI and Coulson as CMI's owner. (*Id.* at 15.) With regard to the other claims, the court held that Expo had failed to plead the underlying facts with the level of particularity required for an allegation of fraud under Rule 9(b) of the Federal Rules of Civil Procedure. However, the court held that it would allow Expo to file an amended complaint to attempt to rectify the deficiencies. (*Id.* at 17.)

On July 31, 2019, Expo filed its Amended Counter-Complaint. (Docket No. 23.) The Amended Counter-Complaint contains six counts. Some of the counts are expressly limited to some defendants, while others are not. Count I is for declaratory relief and is not directed at any

particular defendant; Count II is for intentional misrepresentation and civil conspiracy and is explicitly directed at all three CMI Parties; Count III is for violation of the Tennessee Consumer Protection Act ("TCPA") and is directed only at Coulson; Count IV is for punitive damages, treble damages, damages for delay, and consequential damages and is not directed at any particular defendant; Count V is for unjust enrichment and is directed only at CMI and Coulson; and Count VI is for attorney's fees and is not directed at any particular defendant. (*Id.* ¶¶ 103–61.)

On August 14, 2019, CMI, Coulson, and Geditz filed a Motion to Dismiss, asking the court to dismiss the following claims: all claims against Geditz; Count II, in its entirety, as to Coulson; the civil conspiracy component of Count II as to CMI; and Count V as to Coulson.(Docket No. 25 at 2.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff" and "accept its allegations as true." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Unless additional pleading requirements specific to the plaintiff's claims say otherwise, the Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial

plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Rule 9(b) of the Federal Rules of Civil Procedure states that, when pleading fraud, "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). "Rule 9(b) does not

require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

### III. ANALYSIS

#### A. Count II

##### 1. Intentional Misrepresentation Claim Against Geditz

The CMI Parties argue first that Expo has failed to allege its claim of intentional misrepresentation against Geditz with the level of particularity required by Rule 9(b). A plaintiff asserting a cause of action for intentional misrepresentation must establish six elements:

> (1) that [the defendant] made a representation of an existing or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that [the defendant] made the representation recklessly, with knowledge that it was false, or without belief that the representation was true; (5) that the [plaintiff] reasonably relied on the representation; and (6) that [the plaintiff was] damaged by relying on the representation.

*Davis v. McGuigan*, 325 S.W.3d 149, 154 (Tenn. 2010) (citing *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)). In order to effectively plead any of those elements, a plaintiff must identify, at least generally, "who [is alleged to have] made particular misrepresentations and when they were made." *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992). Accordingly, claims for intentional misrepresentation against multiple defendants "require[] specific allegations as to each defendant's alleged involvement . . . ." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). Mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s specificity requirements . . . ." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005).

8

Expo's Amended Counter-Complaint contains a number of additional allegations regarding Coulson's alleged misrepresentations to Expo and its agents regarding CMI's licensure and its failure to obtain the necessary building permits. There are, however, no corresponding allegations of false statements by Geditz to Expo. The Amended Counter-Complaint does allege that Geditz, along with Coulson, misrepresented CMI's history as part of the company's state licensure application by falsely claiming that the company was not already active in the state. (Docket No. 23 ¶ 29.) That application, however, was directed to the Tennessee Board for Licensing Contractors, not Expo. The allegedly false statement in the application therefore does not satisfy the requirements of an intentional misrepresentation claim by Expo, which was not the recipient of the false information and had no reason to rely on it. Similarly, Expo claims that Geditz had some undescribed role in the decision to alter CMI's license documentation (*Id.* ¶ 36), but there is no allegation that Geditz personally showed that altered documentation to Expo or lied to Expo about the license himself. To the contrary, the target for any misrepresentation on the license documentation itself appears to have been local permitting authorities.

When it comes to alleged misrepresentations on which Expo itself reasonably relied, Expo continues to resort improperly to group pleading in order to sweep Geditz into its allegations. (*See id.* ¶¶ 39–42, 45, 115, 138.) In its briefing, Expo argues that its allegations regarding Geditz are sufficient because it has placed Geditz, along with Coulson, at the center of the scheme to fraudulently modify CMI's license. (Docket No. 27 at 6.) Even assuming that that is true, however, it is not the same thing as alleging that Geditz made a material misrepresentation on which Expo itself reasonably relied. The court, accordingly, will dismiss the non-conspiracy portion of Count II as to Geditz.[2]

---

[2] Expo—which has already been granted the opportunity to remedy its deficiently pleaded claims once—asks the court to dismiss any claims "without prejudice so that discovery may take place and Expo be

2. Intentional Misrepresentation Claims Against CMI and Coulson

The CMI Parties argue next that, although Expo provided more detail about Coulson's alleged misrepresentations on behalf of CMI, it has still failed to plead intentional misrepresentation by Coulson with sufficient particularity. The CMI Parties take particular issue with Expo's pleading of several facts, including those involving Coulson's state of mind, "on information and belief."

Generally speaking, a plaintiff seeking to comply with Rule 9(b) must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bledsoe*, 501 F.3d at 504 (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). Courts, however, have recognized that fraud often involves subterfuge and misdirection that may leave a victim in the dark about many of the details of a scheme, even after he realizes he has been defrauded. Accordingly, "Rule 9(b)'s particularity requirement may be relaxed when certain information is solely within the defendant's knowledge." *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 630 (N.D. Ohio 2016) (quoting *SEC v. Blackwell*, 291 F. Supp. 2d 673, 691 (S.D. Ohio 2003)).

It is well-settled that the Federal Rules of Civil Procedure allow a plaintiff to plead a fact "on information and belief" if the plaintiff "lack[s] personal knowledge of [the] fact, but ha[s] 'sufficient data to justify interposing an allegation on the subject.'" *Starkey v. JPMorgan Chase Bank, NA*, 573 F. App'x 444, 447–48 (6th Cir. 2014) (quoting Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1224 (3d ed.)). Indeed, without allowing some form of pleading on information and

---

allowed to assert claims as more evidence is found." (Docket No. 27 at 2.) The court will not depart from ordinary practice based on the speculative possibility of future new evidence. The dismissed claims will be dismissed on the merits and, if Expo wishes to raise a later motion for reconsideration based on new evidence, it can do so, and the issue can be addressed then.

belief, the Federal Rules would often place plaintiffs asserting intentional torts, in particular, in an impossible position. Intentional misrepresentation, for example, requires a plaintiff to allege facts about the defendant's knowledge and/or belief. But what someone knows or believes is typically not a fact that can be observed directly, like the speed of a car or the slipperiness of a floor. All anyone can know about anyone else's state of mind is what he can infer from clues and context, and that problem is particularly acute in instances of fraud, where concealment of one's true beliefs and motivations is central to the underlying scheme. Accordingly, a plaintiff can plead knowledge on information and belief, as long as he "plead[s] a particular statement of facts upon which his belief is based." *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489–90 (6th Cir. 1990) (citing *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1003–04 (2d Cir.)); *see also Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) (citing *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

Expo has pleaded facts sufficient to support the belief that Coulson was aware that CMI was not, in fact, licensed to perform construction projects of unlimited cost in Tennessee. Coulson was the owner and president of the company, and he was central to the bid for the Expo hotel. The extent of CMI's Tennessee licensure was an issue of paramount importance to the company and the bid. Coulson signed the hardship license request seeking an unlimited license. (Docket No. 9-7.) He signed the subsequent request that specifically asked for a license that did have a limit. (Docket No. 9-8.) Coulson was also the individual communicating with Expo about CMI's failure to obtain building permits and assuring them that licensure was not the issue. (Docket No. 23 ¶ 79.) Although none of these facts offers ironclad proof that Coulson was aware that CMI was turned down for an unlimited license, they provide a sufficient basis for an inference of knowledge for the purposes of pleading a claim. It is, of course, possible that Coulson did not monitor the

11

license application process, that someone misrepresented the outcome of the process to him and altered the license without his knowledge, and that Coulson then also failed to monitor the building permit application process, and someone within the company misrepresented to him why the permits were not being issued. It is not Expo's burden at this stage, however, to rule out every innocent explanation for the facts it has pleaded. Expo has pleaded, with particularity, a reasonable basis for its inference of knowledge on Coulson's behalf. That is sufficient.

The other aspects of Expo's intentional misrepresentation claims against CMI and Coulson are sufficiently well-pleaded as well. Expo alleges that Coulson misrepresented CMI's licensure status and the reason it was unable to obtain building permits. Those statements are placed within a definite, limited time period, and at least one misrepresentation is tied to a specific meeting with an identified individual, Shah, and Shah is identified as the recipient of later false communications as well. (*Id.* ¶¶ 47, 53, 72.) Expo alleges that it reasonably relied on those misrepresentations in choosing to go into business with CMI and continuing to delay the hotel project rather than severing the companies' relationship, leading to harm to Expo. These facts constitute an allegation of intentional misrepresentation made with sufficient particularity to comply with Rule 9(b).

### 3. Conspiracy

CMI argues next that the conspiracy claims against Coulson, Geditz, and CMI should be dismissed as barred by the doctrine of intracorporate conspiracy immunity, which significantly limits the degree to which employees of a single company can be held liable for conspiracy with regard to matters related to the company's business. The Tennessee Supreme Court has held that, "for a claim of intracorporate conspiracy to be actionable, the complaint must allege that corporate officials, employees, or other agents acted outside the scope of their employment and engaged in conspiratorial conduct to further their own personal purposes and not those of the corporation."

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 704 (Tenn. 2002) (citing *Renner v. Wurdeman*, 434 N.W.2d 536, 542 (Neb. 1989)). "[T]here can be no actionable claim of conspiracy where the conspiratorial conduct alleged is essentially a single act by a single corporation acting through its officers, directors, employees, and other agents, each acting within the scope of his or her employment." *Id.* at 703–04. CMI points out that, insofar as there was any fraudulent conspiracy between Coulson, Geditz, and CMI, it was in furtherance of a single corporate scheme on CMI's behalf.

Expo argues that the intracorporate conspiracy doctrine does not bar claims against Coulson and Geditz because, when they allegedly took part in the alteration of CMI's license documentation, they were not acting within the scope of their employment. The Tennessee Supreme Court has recognized that "there is no bright-line rule" regarding when an employee or officer's act is taken in the course of employment but has identified a number of relevant factors. *Hughes v. Metro. Gov't of Nashville & Davidson Cty.*, 340 S.W.3d 352, 366 (Tenn. 2011). Among those factors are:

> (a) whether or not the act is one commonly done by such servants;
> (b) the time, place and purpose of the act;
> (c) the previous relations between the master and the servant;
> (d) the extent to which the business of the master is apportioned between different servants;
> (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
> (f) whether or not the master has reason to expect such an act will be done;
> (g) the similarity in quality of the act done to the act authorized;
> (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
> (i) the extent of departure from the normal method of accomplishing an authorized result; and
> (j) whether or not the act is seriously criminal.

*Id.* at 364. Based on those factors, Coulson and Geditz's actions—as loosely defined as they are, particularly with regard to Geditz—were all well within the scope of their employment. Coulson

13

and Geditz were key CMI employees routinely entrusted to perform important business. Obtaining permits and licenses is an ordinary practice at the core of CMI's business, and they were entrusted with overseeing the process. Fraudulently obtaining high-dollar business would, moreover, be in the interests of CMI, not any divergent personal interest of either Coulson or Geditz. The only factors that would caution against the conclusion that Coulson and Geditz were acting within the scope of their employment are the final two—departure from ordinary business practices and potential criminality. But those two factors would arise in *every* corporate fraud case. If the court held that the presence of fraud could defeat the doctrine of intracorporate conspiracy immunity, then the court would be rendering the doctrine essentially meaningless in any corporate fraud case.

Nevertheless, that is exactly what Expo has asked the court to do. The entirety of its argument that Coulson and Geditz were acting outside the scope of their employment is that "[a] conspiracy to commit fraud on the permitting offices and consumers in the state of Tennessee is not something any employer would contemplate." (Docket No. 27 at 11.) According to Expo's own allegations, however, that type of fraud is exactly what CMI contemplated. Recognizing Expo's argument would mean a complete repudiation of intracorporate conspiracy immunity in fraud cases, in violation of Tennessee law. The court, accordingly, will dismiss the claims of conspiracy as to all parties, while allowing the intentional misrepresentation claims against Coulson and CMI to proceed.

### B. Count IV

The CMI Parties argue that Expo's unjust enrichment claims—which are directed only at CMI and Coulson—should be dismissed as against Coulson, because Expo has failed to allege specific facts sufficient to state a claim against Coulson individually. Under Tennessee law, the elements of an unjust enrichment claim are: (1) a benefit was conferred upon the defendant by the

plaintiff; (2) the defendant appreciated the benefit; and (3) it would be inequitable for defendant to retain the benefit without paying for it. *Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006) (quoting *Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005)). The CMI Parties argue that Expo has only alleged that an inappropriate benefit was conferred upon CMI, not Coulson, and that Coulson therefore is not an appropriate defendant under Count IV.

In Response, Expo argues the following, which it does not link to any particular legal doctrine:

> Coulson received payments, as agent for CMI for overhead and profits that he was not entitled to receive[], because neither Coulson nor CMI had the proper licensure. All of Expo's financials went through Defendant Coulson who signed all of the payment applications. Because there was no contract with CMI for this work, Defendant Coulson would be unjustly enriched if he retained any portion of the overhead and profits given to him based on the fact that he received the payments and did not have a general contractor's license.

(Docket No. 27 at 12 (citations to Amended Counter-Complaint omitted).) In most situations, allegations of that sort would not be sufficient to establish liability on behalf of the owner of a company. Rather, the plaintiff would have to meet the higher bar of establishing that it can pierce the corporate veil, allowing it to "attribute the actions of a corporation to its shareholders." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88 (Tenn. 2010). To pierce the corporate veil under Tennessee law, "a court must be convinced that the separate corporate entity 'is a sham or a dummy' or that disregarding the separate corporate entity is 'necessary to accomplish justice.'" *Id.* (quoting *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003)).

The Tennessee General Assembly, however, has recognized an exception to that general rule for the specific situation of general contracting companies and their owners' misrepresentation of their licensure status. Under Tenn. Code Ann. § 62-6-136(c), an individual who falsely holds

15

himself out as licensed for general contracting but who "would . . . have limited liability as owner of an entity having limited liability protection, including, but not limited to, a corporation, is personally liable for the individual's own representations, acts or omissions to the same extent as if that individual rendered the representations, acts or omissions as an individual." Coulson, accordingly, can be held personally liable for his licensure-related misrepresentations to the same degree as CMI. The court will not dismiss Count IV as to him individually.

## C. Counts I & VI as to Geditz/Termination of Geditz as a Party

The CMI Parties have also moved the court to dismiss the claim for attorney's fees against Geditz, relying on largely the same argument as they advanced with regard to fraud—that Expo has failed to allege actionable wrongdoing by Geditz as an individual and has no right to recovery. In Response, Expo argues that it is entitled to attorney's fees from Geditz under the TCPA. Expo's TCPA claim, however, is not directed at Geditz.[3] (Docket No. 25 ¶¶ 132–39.) The claim against Geditz for intentional misrepresentation under Count II is being dismissed, and Expo has not identified any other basis for recovery of attorney's fees from Geditz. The court will therefore dismiss Count VI as to him. Geditz, moreover, was not named as a defendant with regard to counts III and V. That leaves only two claims left directed at Geditz: Count I, for declaratory judgment; and Count IV for punitive damages, treble damages, and consequential damages. Punitive damages, treble damages, and consequential damages, however, are all remedies, not causes of action. The only actual claim remaining against Geditz, therefore, is the claim for declaratory judgment—insofar as Expo actually intends to name Geditz as a defendant with regard to that claim, which is not entirely clear.

---

[3] The actual count of the Amended Counter-Complaint attributed to the TCPA is expressly directed only at Coulson. (Docket No. 25 ¶¶ 132–39.) One paragraph of Count IV, however, which is not actually identified as a TCPA claim, seems to suggest that Expo intends to pursue a TCPA claim against CMI as well. (*See* Tenn. Code Ann. ¶ 144.) That paragraph, as well, does not state a claim against Geditz.

> Expo defines the declaratory relief it seeks as follows:
>
> 106. Expo further seeks a declaration and a construction of any alleged contract oral or written between Expo and the Counter/Third Party Defendants be intercepted by the laws of the State of Tennessee and common law of the State of Tennessee.
>
> 107. Expo further seeks a declaration of rights, status or other legal relation thereunder to determine the legal status of the relationship created by the interactions of the parties specifically that the Contract as presented in Plaintiff/Counter-Defendant's case in chief is not valid or enforceable and is terminated due to Counter/Third Party Defendants' fraudulent representations and/or omissions and the statute of frauds.

(Docket No. 23 ¶¶ 106–07.) Although Expo pleads these claims against the CMI Parties collectively, it provides no explanation for why it would specifically need declaratory relief against Geditz himself. The purpose of a declaratory judgment, under Tennessee law, is "to declare rights, status, and other legal relations." *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 837–38 (Tenn. 2008) (citing Tenn. Code Ann. § 29-14-102). "Although a plaintiff in a declaratory judgment action need not show a present injury, an actual 'case' or 'controversy' is still required." *Id.* (citing *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 95 (1993)). Expo has failed to identify any actual legal conflict between it and Geditz as an individual that would support a declaratory judgment action. The court, accordingly, will dismiss Count I against Geditz (insofar as it is directed at him) and terminate him as a party.

## IV. CONCLUSION

For the foregoing reasons, the CMI Parties' Partial Motion to Dismiss Defendant's Amended Counterclaims (Docket No. 25) will be granted in part and denied in part. The court will dismiss all claims against Geditz and will dismiss the conspiracy claims under Count II against Coulson and CMI.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge